# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| KATHY FOREMAN, as the personal representative of the deceased JESSIE FOREMAN, et al., | ) ) ) | |
| Plaintiffs, | ) ) | Hon. Blanche M. Manning |
| v. | ) ) | 03 C 187 |
| CHICAGO POLICE OFFICER JOHNSON, | ) ) ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

The plaintiff, Kathy Foreman ("the plaintiff" or "Kathy"), as personal representative of the deceased Jessie Foreman, brought suit against Officer Johnson, pursuant to 42 U.S.C. § 1983 for alleged violations of the Fourth and Fourteenth Amendments. Defendant Johnson has filed a motion for summary judgment, which the court denies for the reasons stated below.

## I.    FACTS

Most of the facts are undisputed except as noted herein. Kathy is the widow of the decedent and the personal representative of his estate. Kanissha Price and Kevin Price are the adopted minor children of Kathy and Jessie Foreman. Zeffernee Marie Wilson is the adult daughter of Kathy Foreman and the stepdaughter of Jessie Foreman. Jerone Cook was Wilson's boyfriend until approximately November 30, 2000. In December 2000, Wilson obtained an order of protection against Cook based on incidents that occurred in October and November 2000.

Johnson was at all relevant times an on-duty Chicago police officer acting within the

scope of his employment and under color of state law.[1] On January 11, 2001, in the early evening hours, Wilson returned home from work to the residence where she lived with Kathy and Jessie Foreman (her mother and stepfather), as well as their two children, Kanissha and Kevin, who all were at home.[2] Shortly thereafter, Cook rang the doorbell of the Foreman residence and Wilson answered the door. Wilson told Cook he had to leave, but he pushed her aside and entered the home. Wilson called out to Kathy and Jessie, who were in their bedroom on the second floor of the residence. Kathy and Jessie then left the bedroom and went downstairs.

When they got near the bottom of the staircase, Cook pulled out a gun, said "this shit is over" and told everyone to go down to the basement. Kathy and Jessie retreated up the stairs to their bedroom and Cook followed with Wilson behind him. Kathy and Jessie attempted to close the bedroom door, but Cook got his hand between the door and the door frame. Cook told Jessie that he did not want to harm Jessie or the kids but he wanted to take Kathy and Wilson down to the basement and beat them 10,000 times apiece. Cook continued pushing on the bedroom with Kathy and Jessie pushing on the opposite side in an effort to keep him out. Cook pounded on the door and threatened to shoot through it. Wilson activated the home security system panic alarm, and went to Kanissha and Kevin's bedroom on the second floor. As the alarm sounded, Cook told Kathy and Jessie that if the police responded, someone had to die.

Johnson and his partner Kevin Jennings were on patrol in uniform in their marked car

---

[1]Officers Isaac, Gilbert, Denton and Junirs were originally also named defendants in this case but were dismissed by stipulation on July 31, 2003. While the defendant's statement of facts also includes an officer named Kevin Jennings in this group, the complaint fails to name Jennings and the docket fails to show that he was ever served with summons.

[2]Although the defendants statement of facts fails to expressly so state, the court assumes that these individuals all resided together at the same house (i.e., the "Foreman residence").

when they received a call from the police dispatcher of a panic alarm at the Foreman residence; accordingly, they went to the house. Kathy made a phone call to "911" from her bedroom and she was advised that the police were on their way. On their way to the Foreman residence, Johnson and Jennings received another call from the dispatcher updating the call to a "domestic" with a gun possibly involved.

Officers Gilbert, Denton, and Junirs were working together in civilian clothes in an unmarked police car when they heard the original dispatch and the update to Johnson and Jennings. After hearing the second dispatch, they also proceeded to the Foreman residence. Johnson and Jennings arrived first and the other three arrived soon thereafter. The officers went up the front porch and knocked on the door and rang the doorbell. When no one answered, one of the officers called the dispatcher to find out if the call was bona fide and another officer looked through a window and saw Wilson coming down the stairs to the front door. Wilson opened the door, told the officers that "he" had a gun and then ran to her neighbor's house. The plaintiff disputes this statement of fact, pointing out that Wilson testified at her deposition that she also told the officers that Cook was wearing black pants and a white shirt, was upstairs with her parents, and that children were in the other rooms. At that point, the officers heard gunshots from inside the house, entered the residence and went up to the second floor.

Cook was able to overpower Kathy and Jessie and gain entrance to their bedroom. Inside the bedroom, Cook aimed his gun at Kathy and fired twice, striking her in the left elbow and left thigh. Jessie had grabbed the gun when Cook was firing the second shot, but Cook was still able to fire. Johnson was the first police officer who went upstairs to the second floor. He positioned himself by straddling the doorway of the southwest bedroom, which was down the hall from

Kathy and Jessie's southeast bedroom. Johnson was facing east down the hallway and was holding his service weapon in his left hand. Gilbert was the next officer up the stairs, and he positioned himself at the top of the stairs across the hallway from Johnson. Jennings, Denton and Junirs were behind Gilbert on the stairway leading to the second floor.

The officers heard a commotion coming from the southeast bedroom, and heard more gunshots. They announced "police" and shouted that whomever was in the bedroom should come out "with your hands up." After being shot twice by Cook, Kathy ran out of the southeast bedroom. Before she left, she saw Jessie and Cook on the bedroom floor struggling over the gun. Kathy ran from the bedroom down the hallway to the southwest bedroom, into the closet and collapsed.

From his position at the threshold of the southwest bedroom, Johnson saw Kathy run from the southeast bedroom and down the hallway to the southwest bedroom where he was standing. He saw that she was bleeding and that she went into the bedroom closet. He then focused his attention back on the southeast bedroom and heard more gunshots coming from that bedroom. Jessie, wearing a gray t-shirt and plaid boxers or pajama shorts, then fell out of the southeast bedroom door. As he fell, Cook fired his gun at Jessie from behind, creating muzzle flashes.

Johnson fired three shots, west to east along the south wall of the hallway, in the direction of the muzzle flashes. When he fired his weapon, Johnson was trying to stop Cook from firing at Jessie. At the time Johnson fired his weapon, he had not seen Cook in the hallway and from his position in the doorway of the southwest bedroom, Johnson could not have shot into the southeast bedroom where Cook was located. The distance between the southwest bedroom

doorway where defendant Johnson fired his weapon and the doorway to the southeast bedroom is approximately ten feet.

After the shooting at the Foreman home, Johnson signed a Chicago Police Department Weapon Discharge Report, in which, as "reporting officer," he asserted that Cook had "exited bedroom firing weapon in direction of [Jessie] and [reporting officers]." The plaintiff asserts that the report was false because Johnson never observed Cook exit the southeast bedroom or fire his weapon in Johnson's direction. Johnson denies the report is false; rather, he contends that while the report is inaccurate in some respects, it plainly states that it should not be considered a verbatim statement but only a summary regarding requested information. The report also states that "fearing for his and victims [sic] life," he fired two shots in the direction of the offender. Johnson testified at this deposition that contrary to the statement in the report, he was not in fear of his own life when he fired his weapon.

Gilbert testified that as Jessie fell out of the bedroom door, Cook was shooting at Jessie and Gilbert moved back behind the wall because if one of the shots had "gotten past," Gilbert would have been in jeopardy of being shot. After Johnson fired his weapon, Gilbert attempted to pull Jessie toward him, but was unsuccessful because Cook was not visible to him and Gilbert was in Cook's direct line of fire. Gilbert eventually gained sight of Cook in the southeast bedroom. When Cook directed his gun at Gilbert, Gilbert fired his weapon at Cook.

Jessie sustained six gunshot wounds as a result of the incident and died. One of the bullets recovered from Jessie's body at the autopsy was later determined to have been fired from Johnson's weapon. Cook was convicted in the Circuit Court of Cook County of the first-degree murder of Jessie Foreman, the attempted first degree murder of Kathy Foreman, and the

aggravated discharge of a weapon at the police.

## II.   SUMMARY JUDGMENT STANDARD

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).  A genuine issue of material fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The existence of a factual dispute is not sufficient to defeat a summary judgment motion, instead the non-moving party must present definite, competent evidence to rebut the movant's asserted facts. *Butts v. Aurora Health Care, Inc.*, 387 F.3d 921, 924 (7th Cir. 2004).

## III.   ANALYSIS

A.   The Fourth Amendment claim[3]

---

[3]The plaintiff's complaint alleges that Jessie's seizure violated the Fourth Amendment because it was "not supported by probable cause and was accomplished through the use of grossly excessive force." Comp. at ¶ 19.  It is not clear to the court on what theory the plaintiff's probable cause claim is based.  In his opening brief, Johnson asserts that probable cause existed to use deadly force and the plaintiff merely responds that while probable cause to use deadly force may have existed as to Cook, the gunman, it did not exist as to Jessie Foreman.  Moreover, in his reply brief, Johnson asserts that even assuming a seizure took place, Johnson's "use of force was not objectively unreasonable." Reply at 8.  The only discussion regarding the seizure is whether the shooting constituted a seizure and, if so, whether the force used was excessive. Accordingly, because neither the plaintiff nor the defendant analyze the facts as a lack of probable cause for the seizure, the court will not construe the claim as such and, in turn, will not address it.  The court construes the Fourth Amendment claim for purposes of this motion as based solely on excessive force.  In any event, the court notes that the analysis for lack of

Before addressing whether excessive force was used, the court must determine whether a "seizure" occurred under the Fourth Amendment.

   1.   *Was Jessie Foreman seized?*

Count I of the plaintiff's complaint seeks relief under 42 U.S.C. § 1983 for the alleged unreasonable seizure based on excessive force of Jessie Foreman under the Fourth Amendment. Defendant Johnson argues that the uncontested facts show that Jessie was not "seized" within the meaning of the Fourth Amendment, and thus no constitutional violation could have occurred.

"'[A]ll claims that law enforcement officers have used excessive force ⋯ in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard⋯.'" *Acevedo v. Canterbury,* --- F.3d ---, 2006 WL 2290698, at *2 (7th Cir. Aug. 10, 2006) (*quoting Graham v. Connor*, 490 U.S. 386, 395 (1989) (emphasis omitted)). "It is clear . . . that a Fourth Amendment seizure does not occur whenever there is a governmentally caused termination of an individual's freedom of movement (the innocent passerby), nor even whenever there is a governmentally caused and governmentally *desired* termination of an individual's freedom of movement (the fleeing felon), but only when there is a governmental termination of freedom of movement *through means intentionally applied*." *Brower v. County of Inyo*, 489 U.S. 593, 596-97 (1989) (emphasis in original). In other words, "the Fourth Amendment addresses 'misuse of power,' not the accidental effects of

---

probable cause as to the seizure and the excessive force analysis are quite similar and are both based on the reasonableness of the conduct given the circumstances. *See Flynn v. Mills*, No. 1:03-CV-00515-TAB-JD, 361 F. Supp.2d 866 (S.D. Ind. 2005) (in a Fourth Amendment case with similar claims, stating that "[a]lthough the Plaintiffs clothe their federal claims under various guises, i.e. unreasonable seizure, excessive force, false arrest, and false imprisonment, the critical inquiry in determining whether [the police officers] are entitled to qualified immunity is whether their actions were reasonable under the circumstances known to them at the time.")

otherwise lawful government conduct." *Id.* at 596 (citation omitted). *See also Campbell v. White*, 916 F.2d 421, 422-23 (7th Cir. 1990) ("To presume the existence of a seizure under the circumstances presented in this case ignores the distinction that has been made between an accidental or tortious act which happens to be committed by a government official and an intentional detention that rises to the level of a constitutional violation.").

Here, Johnson and others yelled commands at the gunman including "Police. Police. Come out with your hands up. Show us your hands."[4] After positioning himself in the southwest bedroom doorway, Johnson saw Kathy run bleeding from the second floor southeast bedroom in the Foreman home after hearing shots fired. Johnson then turned back to focus on the southeast bedroom when he heard more gunshots in that bedroom and saw Jessie falling into the hallway with "Cook shooting at him [Jessie]." Johnson Dep., Exh. E at 57. Johnson then clarified, however, that he did not actually see Cook shooting, but only saw muzzle flashes. Johnson then stated that "as Mr. Foreman is falling and I see the muzzle flashes I shoot in the direction of the muzzle flashes." *Id*. at 59. Johnson testified that from where he was positioned, he could not have fired into the southeast bedroom itself. One of Johnson's three shots hit Jessie.

With these facts, the plaintiff argues that a reasonable jury could find that when Jessie fell into the hallway, Johnson immediately began "shooting at him" without making any determination as to whether Jessie was the gunman or the innocent victim. Therefore, the plaintiff contends that a jury could find based on these facts that Johnson intentionally shot and thereby "seized" Jessie. *Brower*, 489 U.S. at 496 ("A seizure occurs even when an unintended

---

[4]This testimony by Johnson is not included in a statement of fact but is set forth in his deposition. Exh. E at 51.

person or thing is the object of the detention or taking, but the detention or taking itself must be willful.").

The plaintiff fails to cite to any specific evidence in support of her contention that a jury could find that Johnson intentionally shot Jessie, and normally this would doom her claim. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts" to survive summary judgment). However, the plaintiff also contends that there is a triable issue of fact based on the police report that was filed immediately after the shooting. Specifically, the plaintiff points out that the post-incident shooting report, which Johnson signed but did not write himself, stated that Johnson fired his gun after Cook had "exited the bedroom firing [a] weapon in [the] direction of" Jessie Foreman, Johnson and Gilbert. Johnson, however, testified that he never observed Cook exit the southeast bedroom into the hallway or fire his weapon in Johnson's direction, only toward Jessie and Gilbert. Moreover, while the report states that he was in fear of his own life, Johnson testified during his deposition that he was not in fear of his own life when he fired the shots. According to the plaintiff, a jury would be entitled to consider Johnson's dishonesty about these facts as affirmative evidence of guilt. *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 147 (2000) (noting "the general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as 'affirmative evidence of guilt.'") (citation omitted).

As noted above, Johnson disputes that these statements were dishonest. According to Johnson, although he signed the report, he states that he did not prepare it. Johnson also points out that the report states that it should not be considered a verbatim statement but only a

summary regarding requested information.[5]

"A court's role [on summary judgment] is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable [material] fact." *Keri v. Board of Trustees of Purdue University*, --- F.3d ---, 2006 WL 2338023, at * 4 (7th Cir. August 14, 2006) (citations omitted). However, "if the credibility of the movant's witnesses is challenged by the opposing party and specific bases for possible impeachment are shown, summary judgment should be denied and the case allowed to proceed to trial, inasmuch as this situation presents the type of dispute over a genuine issue of material fact that should be left to the trier of fact." 10A Wright, Miller & Kane, Federal Practice & Procedure, Civil 3d § 2726 at 446 (1998). *See also Askew v. City of Chicago*, 440 F.3d 894, 896 (7th Cir. 2006) ("If these subjects [as to which the plaintiff claimed inconsistencies existed] were material, then there would be work for the jury to do.").

Thus, the question facing the court is whether the allegedly inconsistent facts–whether Johnson saw Cook in the hallway when Johnson shot his weapon, whether Cook fired at Johnson, and whether Johnson feared for his own life–are material. Material facts are facts that "might affect the outcome of the suit" under the applicable substantive law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When determining whether a genuine issue of material fact exists, the court considers evidence in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The court finds that these facts are material and as such, preclude summary judgment as

---

[5]Oddly, too, although not noted by Johnson, the report states that "[t]his statement is not being given voluntarily, but under duress. I am only giving this statement because I know I could lose my job if I refuse. Sgt. J. Smith #2251 ordered me to give this statement."

to whether Jessie Foreman was seized under the Fourth Amendment. As previously noted, a seizure occurs pursuant to the Fourth Amendment "when there is a governmental termination of freedom of movement *through means intentionally applied*." *Brower,* 489 U.S. at 596-97 (emphasis in original). Accordingly, "[a] seizure occurs even when an unintended person or thing is the object of the detention or taking, but the detention or taking itself must be willful." *Id*. at 496.

Here, the facts at issue--whether Johnson saw Cook in the hallway when Johnson shot his weapon, whether Cook had fired at Johnson, and whether Johnson feared for his own life–could affect the determination of whether Johnson seized Jessie Foreman. For instance, a jury could find it significant whether Johnson thought that Cook was in the hallway when Johnson shot his weapon in ascertaining whether Johnson intentionally "detained" Foreman instead of Cook, the shooter. For this same reason, whether Cook had fired at Johnson and (less so) whether Johnson feared for his own life, are material. Because these facts could affect the outcome of the suit, summary judgment as to whether Jessie Foreman was seized is denied.

2.  *Was the seizure (if any) accomplished through the use of excessive force?*

Even assuming that a seizure did occur, the court must determine whether it was accomplished through the use of excessive force. The Seventh Circuit summarized the Fourth Amendment analysis as to excessive force as follows:

> Under prevailing Supreme Court precedent, "all claims that law enforcement officers have used excessive force-deadly or not-in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) (emphasis in original). *Accord Brosseau v. Haugen*, 543 U.S. 194, ----, 125 S.Ct. 596, 598, 160 L.Ed.2d 583 (2004) (citing *Graham* and applying this same standard); *Lawrence v.*

> *Kenosha County*, 391 F.3d 837, 843 (7th Cir. 2004) (same). This inquiry involves "a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396, 109 S.Ct. 1865 (citations and quotation marks omitted). Not surprisingly, this analysis is "not capable of precise definition or mechanical application" but "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* (citations and quotation marks omitted). *See also Tennessee v. Garner*, 471 U.S. 1, 8-9, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985) (the relevant question is "whether the totality of the circumstances justifie[s] a particular sort of ⋯ seizure").
>
> Additionally, "the 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396, 109 S.Ct. 1865. In excessive force claims, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments-in circumstances that are tense, uncertain, and rapidly evolving-about the amount of force that is necessary in a particular situation." *Id.* at 396-97, 109 S.Ct. 1865. Finally, "[a]s in other Fourth Amendment contexts, the 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397, 109 S.Ct. 1865. *Cf. Scott v. United States*, 436 U.S. 128, 137-39, 98 S.Ct. 1717, 56 L.Ed.2d 168 (1978); *Terry v. Ohio*, 392 U.S. 1, 21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (in analyzing the reasonableness of a particular search or seizure, "it is imperative that the facts be judged against an objective standard").

*Abdullahi v. City of Madison*, 423 F.3d 763, 768 (7th Cir. 2005).

Here, the court finds that genuine issues of material fact exist such that a determination on the objective reasonableness of Johnson's actions is precluded. As noted above, Johnson's credibility about the facts and circumstances at the time of the shooting have been called into question based on contradictory statements in the post-shooting report and Johnson's deposition. Credibility determinations are to be made by the jury at trial and not by the court at the summary judgment stage. Because a detailed analysis of the facts and circumstances of a particular

seizure is necessary in assessing its objective reasonableness, summary judgment is not appropriate, and Johnson's motion on the Fourth Amendment claim is denied.

B. <u>Substantive Due Process Under the Fourteenth Amendment</u>

The plaintiff next argues that assuming the court finds that no seizure occurred to support a Fourth Amendment claim, a reasonable jury could find from the evidence that Johnson's shooting of Jessie meets the "shocks the conscience" standard for a substantive due process violation under the Fourteenth Amendment. *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998) ("[F]or half a century now we have spoken of the cognizable level of executive abuse of power as that which shocks the conscience.").

"[T]he substantive component of the Due Process Clause is violated by executive action only when it can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense." *Id*. at 847 (citation and internal quotation marks omitted). Negligence does not meet the "shock the conscience" standard; rather, "[i]t is, . . . , behavior at the other end of the culpability spectrum that would most probably support a substantive due process claim; conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." *Id*. at 849 (citation omitted). Moreover, the parameters of what constitutes a violation of one's substantive due process rights is fluid and demands a case-by-case analysis of the facts. *Id.* ("Deliberate indifference that shocks in one environment may not be so patently egregious in another, and our concern with preserving the constitutional proportions of substantive due process demands an exact analysis of circumstances before any abuse of power is condemned as conscience shocking."). For example, "attention to the markedly different circumstances of normal pretrial custody and high-speed law

enforcement chases shows why the deliberate indifference that shocks in the one case is less egregious in the other (even assuming that it makes sense to speak of indifference as deliberate in the case of sudden pursuit)." *Id*. at 851.

As a result, when officers are faced with dangerous situations in which split-second decisions must be made, the bar for demonstrating that certain behavior shocks the conscience is higher. *Id.* at 853. ("Like prison officials facing a riot, the police on an occasion calling for fast action have obligations that tend to tug against each other. Their duty is to restore and maintain lawful order, while not exacerbating disorder more than necessary to do their jobs. They are supposed to act decisively and to show restraint at the same moment, and their decisions have to be made in haste, under pressure, and frequently without the luxury of a second chance.") (internal quotation marks and citation omitted). Therefore, "when unforeseen circumstances demand an officer's instant judgment, even precipitate recklessness fails to inch close enough to harmful purpose to spark the shock that implicates 'the large concerns of the governors and the governed.'" *Id*. at 854 (citation omitted). *See also Schaefer v. Goch*, 153 F.3d 793, 798 (7th Cir. 1998) ("The *sine qua non* of liability in cases analogous to high-speed chases, therefore, is 'a purpose to cause harm.'") (citation omitted).

As an initial matter, the court finds the plaintiff's treatment of this issue to be so superficial as to come dangerously close to being forfeited. The plaintiff's entire discussion of the Fourteenth Amendment claim is two paragraphs long, contains no citations to authority and the only argument that the plaintiff sets forth is as follows:

> [P]laintiff submits that a jury reasonably could find from the evidence discussed above that when Officer Johnson intentionally shot Jesse [sic] Foreman, an unarmed man falling down in his underwear, from a distance of about ten feet,

Page 14

> that Officer Johnson did so intending to harm Jesse [sic] Foreman, and that such conduct meets 'shocks the conscience' standard for a Fourteenth Amendment due process claim.

Plaintiff's Resp. at 7. Nevertheless, the court will address the claim. *Davis v. Carter*, 452 F.3d 686, 691-92 (7th Cir. 2006) (finding that plaintiff had not waived *Monell* claim despite district court's conclusion that waiver had occurred based on "perfunctory and undeveloped arguments").

As already described, the important question in this Fourteenth Amendment analysis is whether Johnson had a "purpose to cause harm." This, apparently, is exactly what the plaintiff is arguing–that Johnson intended to shoot Jessie knowing that he was not the gunman. Given the credibility issue identified above, the court cannot definitively ascertain at this time the circumstances surrounding the shooting and whether Johnson had a purpose to cause harm when he shot Jessie. Therefore, Johnson's motion for summary judgment on the Fourteenth Amendment claim is denied.

    C.    <u>Qualified Immunity</u>

Johnson argues that he is also entitled to a finding of qualified immunity. Pursuant to this defense, "government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as the conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

The test for qualified immunity has two steps. "[T]he first inquiry must be whether a constitutional right would have been violated on the facts alleged." *Saucier v. Katz,* 533 U.S.

194, 201 (2001).[6] If no constitutional right has been violated based on the facts alleged, the qualified immunity analysis is finished. *Id*. However, if the facts alleged establish the violation of a constitutional right, the court must inquire whether the right was clearly established in light of the specific context of the case. *See id.*

In addressing qualified immunity, the nonmovant's version of disputed facts must be taken as true. *Payne v. Pauley*, 337 F.3d 767, 775 (7th Cir. 2003). As the court understands it, the plaintiff's version of the relevant facts is as follows: (1) Before entering the house, Johnson had been told that Cook, the gunman, was wearing black pants and a white t-shirt; (2) when he fired his weapon, Johnson could not see Cook; (3) Johnson admits that he was not able to shoot directly into the room in which Cook was standing; (4) Johnson saw Jessie, unarmed, falling out of the southeast bedroom wearing boxer or pajama shorts and a t-shirt when Johnson shot him.

If the jury credits the plaintiff's version of the facts, it could conclude, based upon these facts, that Johnson intentionally shot Jessie when he knew that Jessie was not the gunman.[7] In that event, a constitutional violation on the facts alleged could be established, and the law surrounding this violation was clearly established at the time of the incident. *Tennessee v. Garner*, 471 U.S. 1, 11 (1985) ("[a] police officer may not seize an unarmed, non-dangerous suspect by shooting him dead.").

Johnson argues that the plaintiff has not properly defined the parameters of the

---

[6] The plaintiff asserts that the first part of the test is whether the "*evidence show[s]* that Officer Johnson's conduct in shooting Jessie Foreman violate[d] any constitutional right." Resp. at 8 (emphasis added). The court notes that the plaintiff's recitation of this part of the test is `incorrect.

[7]The court notes that it is gleaning this interpretation from the plaintiff's complaint and her response given that the plaintiff fails to clearly articulate her version of events.

constitutional inquiry – that is, that they are too broad. Specifically, Johnson points to Supreme Court precedent that "the right the official is alleged to have violated must have been established in a more particularized, and hence more relevant sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Saucier*, 533 U.S. at 202 (citations and internal quotations omitted).

Under this analysis, Johnson argues that a reasonable officer in Johnson's position, facing the same situation he faced, could have believed his actions were lawful (i.e., that the use of deadly force was appropriate and Jessie was accidentally shot in the process). *Graham v. Connor*, 490 U.S. 386, 396-97 (1989) (because "police officers are often forced to make split-second judgments-in circumstances that are tense, uncertain, and rapidly evolving-about the amount of force that is necessary in a particular situation," the reasonableness of the officer's belief as to the amount of force must be based on the officer's perspective at that time in that situation).[8] Therefore, he argues, he is protected by qualified immunity. *See Brosseau v. Haugen*, 543 U.S. 194 (2004)(per curiam) (qualified immunity protects officers from the "hazy border between excessive and acceptable force") (citation omitted).

However, in the instant case, since the facts and circumstances surrounding the shooting itself are unclear, the court cannot ascertain the proper analytical framework and state as a matter of law whether any violation of Jessie's rights was obvious or clearly established. *Abdullahi*, 423

---

[8]In the qualified immunity analysis, Johnson makes no mention of whether probable cause existed to seize Jessie; rather, he analyzes the constitutional violation only from an excessive force perspective. Moreover, the plaintiff makes no mention of a lack of probable cause to seize despite alleging in her complaint the seizure was not supported by probable cause. As already noted above, the court addresses the Fourth Amendment claim as based solely on excessive force because the parties have so framed it.

F.3d at 775 (in excessive force claim, denying qualified immunity on grounds that a genuine issue of material fact existed as to the force applied by the officer). Assuming the plaintiff's version of the facts, at least as the court understands them, it would be possible (albeit unlikely) for a jury to conclude Officer Johnson intentionally shot Jessie knowing that he was not the gunman, and thus, Johnson seized Jessie and used excessive force in doing so. Moreover, it is possible that the jury could find facts to support a substantive due process violation (i.e., that Johnson had a "purpose to cause harm.").

On the other hand, a jury could find either that Johnson accidentally shot Jessie such that no seizure occurred or that Johnson intentionally but mistakenly shot Jessie but that the use of force was reasonable, particularly considering the leeway that police officers are given in executing their duties. *Brinegar v. United States*, 338 U.S. 160, 176 (1949) ("Because many situations which confront officers in the course of executing their duties are more or less ambiguous, room must be allowed for some mistakes on their part. But the mistakes must be those of reasonable men, acting on facts leading sensibly to their conclusions of probability."). In that event, Johnson would likely be absolved of any Fourth Amendment or Fourteenth Amendment violation.

Given the questions of fact as to the exact circumstances surrounding the shooting, the court must refrain from making any findings as a matter of law. Accordingly, fact questions preclude summary judgment not only on the constitutional claims but also on the qualified immunity claim. As the Seventh Circuit stated in a qualified immunity analysis on a failure to intervene claim, after concluding that a constitutional violation could be made out on the facts alleged:

> [S]ince the very nature of [the officer's] conduct remains undetermined, one can only speculate as to how visually obvious any violation of Mohammed's rights might have been. In other words, without knowing what Brooks did or how his conduct appeared to onlookers, it would be difficult to say that, as a matter of law, a reasonable officer could not have known that Brooks's conduct violated Mohamed's constitutional rights. A jury should decide whether Brooks's actions would have made it clear to a reasonable officer that intervention was warranted, and, if so, whether Grady, Mueller and Murphy had a realistic opportunity to intervene.

*Abdullahi,* 423 F.3d at 775.

## IV. CONCLUSION

For the reasons stated herein, Johnson's motion for summary judgment is denied. The case is referred to the magistrate judge for a settlement conference prior to trial.

**ENTER:**

**DATE: September 20, 2006**

*/s/ Blanche M. Manning*
_____
**Blanche M. Manning**
**United States District Judge**